UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM JAMAL DEMPS,

       Plaintiff,

v.                                                          Case No: 3:22-cv-044-MMH-SJH

CLARA SMITH, et al.,

       Defendants.

_____

## **ORDER**

### I.  Status

Plaintiff William Jamal Demps, an inmate of the Florida Department of Corrections (FDOC), initiated this action on January 12, 2022, by filing a pro se Civil Rights Complaint (Complaint; Doc. 1)[1] under 42 U.S.C. § 1983. Demps alleges that Defendants, employees of the FDOC, violated his Eighth Amendment right. Id. at 4. Demps also asserts state law claims of assault and battery. Id. at 4–5. As relief, Demps seeks compensatory and punitive damages. Id. at 13. This matter is before the Court on Defendants' Motion for Summary Judgment (Motion; Doc. 77), Demps's Response in opposition to the Motion (Response; Doc. 79), Defendants' Reply (Reply; Doc. 81), and Demps's

---

[1] For all pleadings and documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

Motion to Set a Date for Trial (Doc. 83). Accordingly, this matter is ripe for review.

## II.   Demps's Allegations

On August 23, 2017, Demps arrived at Suwannee Correctional Institutional Annex (Suwannee). Complaint at 5. Shortly after his arrival, Sergeant Jeremy Thomas touched Demps in an inappropriate manner. Id. On August 29, 2017, Demps filed a Prison Rape Elimination Act (PREA) claim against Thomas and was placed in administrative confinement "for a long period of time." Id. When Demps was released from administrative confinement, he was returned to open population and placed in Thomas's dormitory. Id. On September 29, 2017, Thomas saw Demps in the dormitory and threatened him in front of "all the inmates." Id.

On April 15, 2018, at around 1 a.m. Demps "grasp[ed]" Thomas by the arm in an attempt to seek help because he could not breathe.[2] Id. at 6–7. Sometime after Demps grasped Thomas, prison guards—Defendants Hanson, Kirby, Thomas, Russel, Ramsey, Rivas, and Archie—beat Demps and broke eight of his ribs.[3] Id. It is unclear where this encounter occurred. The first time

---

[2] Demps alleges that his inability to breathe was a side effect of the psychotropic medication that he takes every day. Id.

[3] Throughout the Complaint Demps discusses the actions committed by Thomas, Russell, and "other officers," but he does not name the "other officers" until a single sentence on page twenty-one. Complaint at 6, 8–10, 21. Liberally construing Demps's pro se Complaint, the Court will assume that the guards mentioned in Demps's factual allegations are those named on page twenty-one: Defendants

that Demps addresses these allegations in the Complaint, he states that the prison guards were escorting him from L-Dormitory to the medical department when the beating happened. Id. In another part of the Complaint, Demps alleges that the guards were escorting him to P-Dormitory and administrative confinement when the use of force occurred. Id. at 16. In yet another part of the Complaint, Demps states that the use of force occurred in the TV room and then outside when Thomas and other guards were escorting Demps to lock-up confinement. Id. at 21. During Demps's deposition, he testified that he stood up to tell Thomas he could not breathe and Thomas began beating him, and the other guards dragged him outside to continue beating him. Doc. 77-17 at 24–25. In Demps's response in opposition to Defendants' motion to dismiss, Demps stated that the beating occurred outside while Thomas and other guards were taking him to confinement, not the medical department. Doc. 19 at 11. However, in his Response to the Motion, Demps contends that the guards beat him in the TV room, where the surveillance cameras were not working. Response at 6, 11.

In the Complaint, Demps also alleges that Captain Clara Smith stood by and watched as the guards beat him but failed to intervene, and that Wardens

---

Hanson, Kirby, Thomas, Russel, Ramsey, Rivas, and Archie. Id. at 21. Demps also mentions Austin McLendon on page twenty-one, but the Court dismissed McLendon at the motion to dismiss phase because McLendon did not work at Suwanee on April 15, 2018. Doc. 42 at 9–10.

C.E. Lane and Frank Freihofer "were contacted[] and gave [the] command to use [p]hysical [f]orce on" Demps. Complaint at 6, 10, 21. After the use of force the guards "left [Demps] for dead," did not give him any medical attention and no medical post use of force examination was performed. Id. at 9. On May 7, 2018, Demps initiated a sick call at Suwannee's medical department during which doctors examined him and discovered that he had eight broken ribs. Id. at 22. Demps submitted multiple grievances regarding the use of force. Id. at 6; see Doc. 1-6. Thomas wrote a disciplinary report against Demps for battery or attempted battery for the April 15th incident. Id. at 6–7. Demps was found guilty of the charge at a disciplinary hearing and put on close management for two years. Id. at 8.

### III.   Defendants' Evidence

After the April 15th incident, Thomas filed a disciplinary report and a use of force report. Docs. 77-1 at 1; 77-7 at 1. In the report, Thomas stated that at 1 a.m. on April 15, 2018, he was doing a verbal count of L-dormitory when Demps ran up to him, grabbed him by the arm, and pushed him forward. Doc. 77-7 at 1. When Demps did not respond to verbal commands to relinquish Thomas's arm, Thomas used reactionary physical force to push Demps to the floor and, in doing so, caused Demps's face to hit the floor. Id. In the report Thomas does not list any other guard as participating. Id. Medical conducted a post use of force examination twenty-three minutes after the use of force

4

during which Demps complained about a bruised nose and a lump to his temple. <u>Id.</u> at 3. Based on the disciplinary report, Demps was found guilty of battery or attempted battery for this interaction. Doc. 77-1 at 1.

Defendants provide two surveillance videos in support of their Motion. The first shows L-dormitory at 1 a.m. on April 15, 2018. Exhibit 6; Doc. 77-6. The video does not show the entire incident because it mostly occurs out of the camera's view, but when the video starts, Thomas can be seen walking around the room from the upper part of the screen to the upper left part of the screen. <u>Id.</u> Seventeen seconds into the video, right after Thomas disappears from view, someone can be seen running from the top left corner of the screen towards where Thomas was last seen. <u>Id.</u> There is no sound, but within fifteen seconds, other inmates stand up and look towards where Thomas would be standing, and then settle down shortly after that. <u>Id.</u> By one minute and fifteen seconds, the other inmates are no longer looking at anything and are back to their own routines. <u>Id.</u> No other guards are seen in the video. <u>Id.</u> Defendants assert that Demps was the person running at Thomas in the video and Demps seems to admit in his Response that the video depicts him running towards Thomas, or at least does not contest that it is him. Response at 5–6, 11.

The second video begins minutes after the first video ends, at 1:13 a.m. on April 15, 2018, and ends at 1:38 a.m. Exhibit 8; Doc. 77-8. Defendant Ramsey recorded the video on a handheld camera to document other guards

escorting Demps to confinement where a member of the medical staff conducted a post use of force physical after Thomas's reactionary use of force. Id. Demps is hunched over for most of the walk, although it is not clear whether this is due to his restraints or injury, and begins walking upright four minutes and thirty-seven seconds into the video. Id. Once the guards and Demps reach confinement, the video depicts a nurse conducting a post use of force examination on Demps. Id. Through a door with a glass window, the nurse can be seen examining Demps's nose and face followed by his chest and stomach. Id. The video does not depict any force used against Demps. Id. In the Response, Demps does not contest that the video depicts him being taken to receive medical attention.[4] See Response; Doc. 79-2 at 2.

## IV. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

---

[4] Demps attached a "witness statement" to the Response by a correctional officer who states they watched the video of Demps receiving medical attention. Doc. 79-2 at 2. The witness also states that they saw in the video that the nurse wiped something off Demps that appeared to be blood. Id.

purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, [to] designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

Anderson, 477 U.S. at 248; see also McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

"[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Stitzel v. N.Y. Life Ins. Co., 361 F. App'x 20, 22 (11th Cir. 2009) (quoting Anderson, 477 U.S. at 251–52).[5] Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from [the] undisputed [material] facts." Pioch v. IBEX Eng'g Servs., 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997)). Notably "[w]hen opposing parties tell two different stories,

_____

[5] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

## V.   42 U.S.C. § 1983 and the Eighth Amendment

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted). Additionally, the Eleventh Circuit requires "'an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation' in § 1983 cases." Rodriguez v. Sec'y, Dep't of Corr., 508 F.3d 611, 625 (11th Cir. 2007) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)). In the absence of a federal constitutional deprivation or violation of a federal right, a plaintiff cannot sustain a cause of action against the defendant. Kornagay v. Diedeman, No. 3:17-CV-795-J-34MCR, 2019 WL 5802531, at *3 (M.D. Fla. Nov. 7, 2019).[6]

---

[6] The Court notes that although decisions of other district courts are not binding, they too may be cited as persuasive authority. See Stone v. First Union

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. "[T]he unnecessary and wanton infliction of pain" qualifies as "cruel and unusual punishment" under the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 5 (1992). "[T]he core judicial inquiry" in an Eighth Amendment excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Sconiers v. Lockhart, 946 F.3d 1256, 1265 (11th Cir. 2020) (citing Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)). Under this standard, a plaintiff must establish both an objective and subjective element. Sconiers, 946 F.3d at 1265.

The objective element requires a showing that the conduct was "objectively harmful enough to establish a constitutional violation[,]" and "offends 'contemporary standards of decency[.]'" Id. (citing Hudson, 503 U.S. at 8; Wilkins, 559 U.S. at 37). Although "the extent of injury may shed light on the amount of force applied[,]" the Eighth Amendment prohibits excessive force "regardless of whether 'significant injury is evident,' or 'whether the use of force could plausibly have been thought necessary.'" Sconiers, 946 F.3d at 1266 ("[A] lack of serious injury, while not dispositive, is relevant to the inquiry."). The subjective element requires a showing that the official "acted with a

---

Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

sufficiently culpable state of mind" by applying force sadistically, maliciously, and for the purpose of causing harm. Id. (citing Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002); see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010)).

## VI.   Summary of the Arguments

Demps asserts four claims.[7] First, a claim of excessive force against Defendants Hanson, Kirby, Thomas, Russel, Ramsey, Rivas, and Archie for beating Demps and breaking eight of his ribs. Complaint at 4, 21. Second, a claim of deliberate indifference against Defendant Smith for failing to intervene when the guards used excessive force against Demps. Id. at 4, 6, 10. Third, a claim of excessive force against Defendants Lane and Freihofer for directing the other guards to use excessive force against Demps. Id. at 20. Fourth, a claim of assault and battery against Defendants Hanson, Kirby, Thomas, Russel, Ramsey, Rivas, and Archie for beating Demps and breaking eight of his ribs. Id. at 4, 21.

In the Motion, Defendants argue that Demps's claims should be dismissed for three reasons. First, Demps failed to exhaust his administrative remedies as to Hanson, Kirby, Ramsey, Rivas, Archie, Smith, Lane, and Freihofer. Motion at 5–10. Second, Demps cannot show a constitutional violation by any

---

[7] These are Demps's remaining claims after the Court partially granted Defendants' motion to dismiss. See Doc. 42.

Defendant because his inconsistent allegations are refuted by the evidence in the record. Id. at 10–23. Third, Demps's request for punitive damages is barred. Id. at 23–30.

## VII.   Analysis and Conclusions

### A.   Exhaustion of Administrative Remedies

Under 42 U.S.C. § 1997e(a), a prisoner must exhaust his administrative remedies before pursuing a civil rights action under § 1983. See 42 U.S.C. § 1997e(a). Section 1997e requires "proper exhaustion," such that "a prisoner must exhaust all prescribed administrative remedies available to him . . . before filing a lawsuit to seek judicial redress." Garcia v. Glover, 197 F. App'x 866, 868 (11th Cir. 2006) (quoting Woodford v. Ngo, 548 U.S. 81, 93 (2006)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter v. Nussle, 534 U.S. 516, 524 (2002)). Generally, to properly exhaust administrative remedies, a Florida prisoner must complete a three-step process: "(1) file an informal grievance with a designated prison staff member; (2) file a formal grievance with the institution's warden; and then (3) submit an appeal to the Secretary of the FDOC." Dimanche v. Brown, 783 F.3d 1204, 1211 (11th Cir. 2015) (citation omitted).

The Eleventh Circuit has explained the two-step process that the Court must employ when examining the issue of exhaustion of administrative remedies:

> After a prisoner has exhausted the grievance procedures, he may file suit under § 1983. In response to a prisoner suit, defendants may bring a motion to dismiss and raise as a defense the prisoner's failure to exhaust these administrative remedies. See Turner, 541 F.3d at 1081. In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082-83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015); see Pavao v. Sims, 679 F. App'x 819, 823–24 (11th Cir. 2017) (per curiam). When a defendant claims that a plaintiff failed to exhaust their claim in a motion for summary judgment rather than a motion to dismiss, it is treated as if it was brought in a motion to dismiss and examined as set out in Whatley. See Bryant v. Rich, 530 F.3d 1368, 1374–75 (11th Cir. 2008) (citation omitted).

Defendants admit that Demps grieved this incident. Motion at 9. Defendants also admit that Demps exhausted his claims against Thomas and Russel because he named them in his grievances. Id. However, Defendants

argue that Demps did not exhaust his claims against Defendants Hanson, Kirby, Ramsey, Rivas, Archie, Smith, Lane, or Freihofer because he did not mention them in his grievances. Id. at 5–10. In his deposition, Demps admits that he did not name any Defendant other than Thomas and Russell in his grievances. Doc. 77-17 at 33.

"The PLRA requires exhaustion of 'such administrative remedies as are available,' but nothing in the statute imposes a 'name all defendants' requirement[.]" Jones v. Bock, 549 U.S. at 217 (citations omitted). Whether a plaintiff must name all defendants in a grievance is determined by the prison grievance procedure because "[c]ompliance with prison grievance procedures[] [] is all that is required by the PLRA to 'properly exhaust.'" Id. at 218. Under the FDOC grievance procedures "a prisoner need not name any particular defendant in a grievance in order to properly exhaust his claim." Parzyck v. Prison Health Servs., Inc., 627 F.3d 1215, 1218–19 (11th Cir. 2010) ("Nothing in the FDOC's grievance procedures requires inmates to file new grievances addressing every subsequent act by a prison official that contributes to the continuation of a problem already raised in an earlier grievance. The only FDOC requirements regarding the contents of grievances are that they must accurately state the facts and 'address only one issue or complaint.'") (citing Jones v. Bock, 549 U.S. at 219; Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000); Fla. Admin. Code R. 33-103.006(2)(e), (2)(f)).

14

Because Defendants admit that Demps grieved the April 15th incident, and Demps was not required to name each Defendant in the grievances to exhaust his claims, Defendants are not entitled to summary judgment in their favor on this basis.

## B.    Defendants Hanson and Kirby

Defendants Jonathan Hanson and Amanda Kirby contend that they never worked at Suwanee in any capacity. Motion at 3, 13. In support of their contention, Defendants provided a declaration by FDOC human resource analyst Marcha Beane attesting to the fact that no one by either of these names ever worked at Suwannee on the date in question. Docs. 77-4, 77-5. In response to interrogatories sent to them by Demps, Hanson and Kirby attest to the fact that they never worked at Suwanee. Doc. 79-7 at 1, 3. Neither Hanson nor Kirby appears in the surveillance videos, Demps did not name them in his grievances, their names do not appear on the daily security roster, and their names do not appear in any documents regarding the April 15th incident such as the disciplinary report findings or comments. See Exhibits 6, 8; Docs. 1-6, 77-1, 77-2, 77-3, 77-7 at 1.

Demps does not provide any evidence in support of his contention that either Hanson or Kirby was employed at, or present at, Suwannee on the date in question or that either used any force against him other than the fact that he can recite two badge numbers that he alleges belong to Hanson and Kirby.

Response at 4. On this record the Court concludes that Demps presents no more than a scintilla of evidence in support of his claims. Indeed, he provides no evidence to contradict Defendants' evidence that they were not present for the alleged attack. As such, Demps fails to demonstrate that there is a genuine issue for trial. See Jeffery, 64 F.3d at 593–94. Consequently, as to the claims against Hanson and Kirby, the Motion is due to granted.

## C.   Excessive Force

Before proceeding to the merits of Demps's excessive force claim, it is important to note that there are two uses of force at issue in this case.[8] The first use of force occurred when Demps ran toward Thomas in L-dormitory, and Thomas used reactionary force to bring Demps to the ground. Docs. 77-1 at 1; 77-7 at 1. This is the use of force that is documented in the disciplinary report, use of force report, and incident report, and is partially documented on video in Exhibit 6. Exhibit 6; Docs. 77-1; 77-7 at 1, 5. There is no dispute that this use of force occurred, or that Exhibit 6 partially documents it. This use of force is no longer at issue because it was the subject of disciplinary proceedings in which Demps was found guilty of battery or attempted battery against Thomas

---

[8] The Court already made this finding in its order on Defendants' motion to dismiss, but it is worth reiterating the point here for clarity's sake because Demps often conflates these two uses of force in his filings. See Doc. 42 at 21–22.

16

and consequently—as this Court already found at the motion to dismiss phase—is <u>Heck</u>-barred.[9] Doc. 42 at 16–20.

The second use of force is the subject of this dispute and is less clear cut because Demps asserts inconsistent and competing allegations.[10] Demps's allegations seem to fit into one of two versions of events. In one version of events, Demps asserts that when Thomas used reactionary force against him in the TV room—which seemingly adjoins L-Dormitory—the other guards joined in and then dragged him outside to continue beating him. Complaint at 21; Response at 6, 11; Doc. 77-17 at 24–25. In this version of events, Demps seems to assert that the second use of force was an extension of the first, rather than a separate incident. Presumably the claim that Demps never received medical attention and "was left for dead" exists in this version of events because in the second version he was taken to the medical department. Complaint at 9. In the second version of events, Demps seems to contend that the first use of force occurred, ended, and resulted in Demps being escorted to P-Dormitory—either to confinement or to the medical department—during

---

[9] Under <u>Heck</u>, claims that would challenge the validity of a judgment are not cognizable under § 1983. <u>Edwards v. Balisok</u>, 520 U.S. 641, 645, 648 (1997) (citing <u>Heck v. Humphrey</u>, 512 U.S. 477, 487 (1994)).

[10] Demps's allegations may not be as inconsistent as they appear. For example, Demps states that he was beaten on the way to P-Dormitory, but then goes on to state that he was beaten on the way to the medical department. Although these seem inconsistent, they are not because the medical department appears to be in P-Dormitory, based the evidence provided by both parties. Nevertheless, Demps still asserts other inconsistent and competing allegations.

which the named Defendant prison guards began beating him a second time. Complaint at 6–7, 16, 21; Doc. 19 at 11.

The essence of both versions of events is that Defendants Hanson, Kirby, Thomas, Russell, Ramsey, Rivas, and Archie used excessive force against Demps during which they beat him bloody, broke his ribs, and gave him a black eye. Complaint at 6–7, 21. Demps also alleges that Smith watched as this happened but failed to intervene, and Lane and Freihofer authorized the use of force. Complaint at 6, 10, 21. Demps's own inconsistent allegations— regarding where and when the second use of force occurred and who participated in it—in the Complaint, his response to the motion to dismiss, his Response to the Motion for Summary Judgment, his deposition, and his grievances undermine his claim. In addition, Demps's account of the facts is not supported by the evidence.

Demps's medical records do not support either of his versions of the events. After the alleged use of force, medical conducted a post use of force examination. Doc. 77-7 at 3. Defendants provided a medical record of the post use of force examination in which the nurse states that Demps complained only of nose pain. Id. The nurse notated that she observed a bruise on Demps's nose and a lump on his forehead that was caused by the first use of force when Demps's face hit the ground. Id. Notably, the record makes no mention of Demps having a black eye or complaining of rib pain. Id.

Notably, Demps asserts he was "in so much pain from his eight broken ribs" following the use of force on April 15th and was refused medical attention. Complaint at 10. However, Demps provided no sick call request forms from April in support of this contention.[11] See Doc. 1-6. On April 21, 2018, Demps submitted an inmate request with the mental health department alleging that he was "abused and beaten" by Thomas and Russell, but he did not request medical attention and instead stated: "I just wanted to bring this to your attention, [] so you can document this and send me a copy back with your response."[12] Docs. 1-6 at 20; 77-10 at 73. Demps did not initiate a sick call with the medical department until May 7, 2018, three weeks after the alleged use of force. Docs. 19-4 at 2; 77-7 at 11.

Demps provided medical records demonstrating that on May 15, 2018, an X-ray revealed rib fractures. Doc. 1-2; see also Doc. 77-7 at 18. Demps also provided medical records showing he was prescribed pain medication on May 16, 2018. Doc. 1-3. Demps did not provide any records that demonstrate what caused the rib fractures. These medical records show Demps was injured, but, in light of the post use of force examination record and the fact that Demps

---

[11] Demps provided multiple sick call request forms from subsequent months, just not from April when he was apparently suffering without diagnosis or treatment for his recently broken ribs. See Doc. 1-6.

[12] This request seems to refer only to the first use of force, not the second, because Demps only refers to Thomas and Russell who were involved in the first use of force rather than naming the Defendants who allegedly participated in the second use of force.

waited almost three weeks before seeking treatment, they do not associate his injury with the second use of force—or the first use of force for that matter. Although the existence and extent of an injury is not dispositive regarding whether force was excessive, see Sconiers, 946 F.3d at 1266, Demps's failure to provide evidence to associate his broken ribs to the alleged use of force, coupled with the fact that there is no other evidence that the second use of force occurred, undercuts his contention that it did occur.

Other evidence in the record refutes Demps's contention that the second use of force happened. First, the disciplinary report, use of force report, and incident report did not mention the second use of force or contain any indication that anyone other than Thomas used force against Demps on April 15th. Docs. 77-1; 77-7 at 1, 5. Second, in response to interrogatories, Thomas only referred to the first use of force and stated that, to his knowledge, no one beat Demps or broke his ribs, but rather, other guards took Demps to confinement where medical personnel examined him. Doc. 79-8 at 3–5. Third, in response to interrogatories, Defendants Russell, Ramsey, Rivas, and Smith stated that only Thomas used force on Demps in response to being attacked by Demps, and there was no excessive force; and Defendant Archie had no recollection of any uses of force on April 15th at all. Doc. 79-8 at 9–11, 15, 20–

21, 25–26, 29–30, 34–35. Demps does not provide any witness testimony, in the form of deposition transcripts or affidavits, to support his version of events.[13]

Demps's own administrative grievances similarly undercut his claim. See Doc. 1-6. Although it is not entirely clear because Demps often conflates the two uses of force, in his grievances Demps indicated only that the first use of force occurred and that the broken ribs were caused by the first use of force because he stated that Thomas punched Demps in his eye and nose and broke his ribs. See id. Although Demps referred to his black eye and broken ribs in the grievances, he did not reference being dragged outside, being beaten on the way to P-Dormitory, or other officers joining Thomas. See id. Of the one hundred and fourteen pages of grievances, medical records, and medical requests that Demps filed with the Complaint, he mentions "other prison guards" in only three,[14] while in the other grievances and requests Demps names only Thomas and Russell.[15] Id. at 47–48, 71. None of the grievances give any indication that a second use of force occurred.

---

[13] Exhibit 6 shows inmates in L-Dormitory spectating as the first use of force occurred. See Exhibit 6. If Defendants did join Thomas in beating Demps and dragging him outside, as Demps sometimes claims, someone likely would have seen it and could have served as a witness.

[14] Technically there are four of these grievances in Doc. 1-6, but one is a duplicate. See Doc. 1-6 at 47, 86.

[15] In a letter that Demps wrote to the FDOC Inspector General, Demps provided an entirely different account of the April 15th events. Doc. 1-6 at 29. In this letter Demps claimed that at 1 a.m. Thomas woke Demps up and told Demps to fold laundry for him, and once they got to the officer's station, Thomas closed the door and began beating Demps along with Russell. Id.

More importantly, Defendants provided two surveillance videos in support of their Motion that affirmatively contradict Demps's claim. See Exhibits 6, 8. Exhibit 6 begins around the time the first use of force occurred, 1 a.m. on April 15, 2018,[16] and partially depicts the events leading to the first use of force. See Exhibit 6. Exhibit 8 begins at 1:13 a.m. and shows two guards, Rivas and Archie, escorting Demps to the P-Dormitory following the first use of force. See Exhibit 8. Based on Demps's allegations that the second use of force was either an extension of the first use of force or happened before he was taken to P-Dormitory, and the fact that Exhibit 8 does not depict any use of force, the second use of force must have occurred before Exhibit 8 began, if at all.

Demps is hunched over for most of the walk to P-Dormitory but begins to walk upright four minutes and thirty-seven seconds into Exhibit 8. Id. It is not clear whether Demps's posture is due to his restraints or injury. Once Demps reaches confinement, the video depicts—through a door with a glass window—a nurse conducting a post use of force examination on Demps. Id. During the examination, the nurse can be seen examining Demps's nose and face and wiping something off his face.[17] Id. Demps stands up and takes off his

---

[16] Both Demps and Defendants agree this is when the first use of force occurred. Complaint at 6; Motion at 3.

[17] The Court will assume this was blood as Demps seems to claim. Doc. 79-2 at 2.

white shirt without any difficulty to reveal there is no blood on his body, and the nurse briefly looks at his chest and stomach. Id.

This video affirmatively contradicts Demps's claim in three ways. First, Demps asserts multiple times that he was either left for dead or did not receive medical attention. Complaint at 9; Docs. 19 at 11; 77-17 at 35. These contentions are blatantly refuted by Exhibit 8 and contradicted by Demps's own statements that Defendants beat him on his way to receive medical attention. See Complaint at 6–7. Second, Exhibit 8 refutes Demps's claim that Defendants beat him on the way to P-Dormitory because it depicts his journey from L-Dormitory to P-Dormitory and does not show even an inkling of force. Third, a reasonable juror could not watch Exhibit 8 and conclude that anyone beat Demps bloody or broke his ribs minutes before it began because there is no visible blood on his white shirt or body, and he stands and lifts up his arms to take off his shirt without any sign of injury or pain.[18] Exhibit 8 does not permit any inference that Demps was suffering from a beating or freshly broken ribs.

Defendants have a multitude of evidence in their favor and Demps has only his own inconsistent allegations. Even when viewing all evidence in

---

[18] It should also be noted that, although Demps claims that the beating lasted fifteen minutes, Exhibit 8 begins less than ten minutes after the first use of force occurred. Doc. 77-17 at 33.

Demps's favor, no reasonable jury could believe his side of the story as it is "blatantly contradicted by the record" and his own inconsistent allegations. See Morton, 707 F.3d at 1284. Because there is no evidence that the second use of force occurred, no reasonable jury could find that Defendants Hanson, Kirby, Thomas, Russel, Ramsey, Rivas, or Archie used excessive force against Demps. Accordingly, as there was no use of force, Lane, Freihofer, and Smith cannot be liable for sanctioning or being deliberately indifferent to the alleged use of force.

Therefore, the excessive force claims against Thomas, Russell, Ramsey, Rivas, Archie, Lane, and Freihofer are **DISMISSED**. Further, the failure to intervene claim against Smith is also **DISMISSED**.

### D.    Assault and Battery

The dismissal of Demps's underlying federal question claim does not deprive the Court of supplemental jurisdiction over his remaining state law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction") (emphasis added). Although Demps's federal law claims have been dismissed, the Court will continue to exercise supplemental jurisdiction over Demps's assault and battery claims; however, Demps fails to demonstrate an issue of material fact regarding his state law assault or battery claim.

24

Under Florida law, "[a]n 'assault' is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Fla. Stat. § 784.011(1). Demps does not allege an assault because he does not allege that any Defendant threatened him, nor does he present any evidence to support such an allegation. Therefore, there is no issue of material fact requiring submission to a jury on this issue.

As to the battery claim, under Florida law, "[t]he elements of simple battery are: (1) actually and intentionally touching or striking another person; and (2) against the will of the other person." Khianthalat v. State, 974 So. 2d 359, 361 (Fla. 2008) (citing Fla. Stat. § 784.03(1)(a)(1) (2002)). Battery can also occur when someone "[i]ntentionally causes bodily harm to another person." Fla. Stat. § 784.03(1)(a)(2). Even when viewing all evidence in Demps's favor, he fails to demonstrate that the Defendants touched or struck him and fails to show his broken ribs were caused by Defendants. See Haves, 52 F.3d at 921 (citing Dibrell Bros. Int'l, S.A., 38 F.3d at 1578). Therefore, Demps fails to put forth evidence that shows a sufficient disagreement requiring submission to the jury regarding whether the Defendants battered him.

Consequently, Demps's assault and battery claims are **DISMISSED**.

Accordingly, it is

25

**ORDERED AND ADJUDGED**:

1.     Defendants' Motion for Summary Judgment (Doc. 77) is **GRANTED**.

2.     Plaintiff William Jamal Demps's Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**.

3.     Demps's Motion to Set a Date for Trial (Doc. 83) is **DENIED** as moot.

4.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the case.

**DONE** and **ORDERED** at Jacksonville, Florida, this 22nd day of August 2024.

**MARCIA MORALES HOWARD**
United States District Judge

c:     William Jamal Demps
       Counsel of record
       OCAP-4